[Civ. No. 8205.   Third Dist.   Apr. 30, 1954.]

ROBERT N. DIKE et al., Appellants, v. GOLDEN STATE COMPANY, LTD. (a Corporation) et al., Respondents.

Desmond, Miller & Artz for Appellants.

Russell A. Harris for Respondents.

PEEK, J.—Plaintiffs, as the surviving parents of Barry Wayne Dike, instituted this action to recover damages for the death of their 2-year-old child, alleged to have resulted from the negligent operation of one of defendant company's trucks by its employee, defendant Ehrhart. The defendants' answer denied negligence on the part of defendants, and as an affirmative defense, alleged contributory negligence on the part of plaintiffs. At the conclusion of the trial the jury returned a verdict in favor of defendants. Plaintiffs' motion for a new trial was denied. They now appeal from the judgment entered pursuant to the verdict and from the order denying their motion.

Three main contentions are made: (1) That it was error for the court to exclude the testimony of the autopsy surgeon; (2) that it was error for the court to give an instruction offered by defendants relative to the contributory negligence of a "person injured"; and, (3) that it was prejudicial error to instruct on unavoidable accident.

Since the first two contentions appear to be well founded, and since the sufficiency of the evidence is not attacked, it is unnecessary to discuss the third contention or the evidence at length except as the latter relates to the questions so raised.

The accident occurred on El Camino Avenue in the county of Sacramento near plaintiffs' home. The street at that point is divided; that is, the northerly half is used for through traffic, and the southerly half is used primarily as

an access road to the homes fronting thereon. The Dikes' home was one of several houses of similar design on that street. To the west of their home was the residence of the Green family; the Zimmermans' home was to the east; and immediately next to them the Dreyfus family. The Dike and Green garages adjoin, as do the Zimmerman and Dreyfus garages. From the point in front of the Zimmerman house where the child was struck, to the Green garage where he had been playing, was approximately 110 feet, which area was open lawn, there being no sidewalk. Defendants' truck was parked on the wrong side of the street in front of the Dreyfus home, Ehrhart's only customer in that block. The Zimmermans' car was parked immediately in front of the truck. The accident occurred as the defendant driver pulled away from the curb to go around the Zimmerman car.

Testimony concerning the whereabouts of the child prior to the accident was given by Mrs. Dike and two neighbors, Mrs. Green and Mrs. Zimmerman. Mrs. Green testified that while working in the front bedroom of her home she saw Mrs. Dike standing by Mrs. Zimmerman near the Zimmerman car; that she heard her small daughter, Peggy Zimmerman and the Dike child playing in the garage; that being apprehensive that they might mar some laundry she had just hung there to dry, she instructed them to leave the garage, closed the garage door and took her daughter into the house; that when she last saw the Dike child he was going toward his home; that Peggy stayed on for a moment and then ran after Barry; that she immediately reentered her home, going directly to the bedroom where she was working; that as soon as she reached that room she heard the driver scream.

Mrs. Zimmerman testified that when she had first walked out to the car where her husband was sitting, all three children were there; that the children then left to play on the lawn; that she heard Mrs. Dike say something about getting Barry off of the lawn because he would catch cold; that she did not notice the truck until it was just starting up from where it had been parked at the curb; that she could not remember whether at that time the children were near the adults or were on the lawn; that she had just reached the house when she heard the truck driver; that she had no recollection of seeing Barry at that time; that the last time she saw him was when the children left from where they were by the car to go to the lawn to play.

Mrs. Dike testified that when she first saw Mr. Zimmerman

in the car she picked Barry up and started with him to where the car was parked; that she set him on the lawn to play while she went to inquire of Mr. Zimmerman concerning some photographs which had been taken of the children; that she watched the children as they played on the lawn; that she saw them when they left to play in the Green garage where there were toys and a sandbox; that during her conversation with the Zimmermans she continued looking towards the garage; that she saw Mrs. Green close the garage door, but did not see the children come out; that after leaving the Zimmerman car and while walking towards the garage to get Barry, the Zimmerman girl passed her coming from the Green garage; that it was her intention to go there and get the boy, however, she noticed the front door to her home was open and went there to investigate before going to the garage; and that just as she stepped into the living room she heard the driver scream. She further testified that Barry only played on the front lawn when she was with him; that he never played in the street; that on one occasion he had started to cross the street to go to a school near their home with some neighbor children, but that she brought him home; that when she left the Zimmermans' car she did not look for Barry, feeling that he was still playing in the Greens' garage.

The defendant driver testified that the truck was more than 16 feet long; that it had large doors on either side; that it was built low to the ground, there being only one step into the truck; that because of its construction there were blind spots for a distance to the front and sides; that when he first stopped his truck to make his delivery, he noticed two women and several children standing near the front of the Zimmerman car; that when he returned from making the delivery and started his truck, he saw the women, but only two of the three or four children who were there previously; that in starting, he turned his truck away from the curb to pass the Zimmerman car; that after first stopping to allow Mrs. Zimmerman and two children to walk around the car he proceeded forward in low gear; that when she left he took it for granted that there were no more children around; that he then watched only Mrs. Dike who was walking along the curb line about 20 feet ahead of him; that until he stopped he did not take his eyes off of her; that he did not look for the other children; that when he was some 20 to 30 feet from where he had started he felt a bump;

that he stopped the truck approximately 35 or 40 feet from the starting point and got out to see what had happened. In particular his testimony was that the bump was "... definitely the left hind wheels. Had it been anything else I would have felt it." His testimony was in conflict with the statements he made to a highway patrolman immediately following the accident when he stated he did not know how it happened.

Officer Eklund of the Highway Patrol testified that the truck was stopped approximately 47 feet from the point of impact which he placed at a point directly in front of the Zimmerman driveway and approximately 5 feet and 6 inches from the curb. The officer further testified that the vision of one sitting in the driver's seat of the truck and looking directly forward would be obscured for a distance of approximately 21 feet; on an angle of approximately 45 degrees to the left side one's vision would be obscured for a distance of 15 feet, and for approximately 4 feet directly through the door on the left side of the truck. He testified further that the defendant driver told him he did not know how the accident happened; that he had not seen the child; and, that when he had started up he thought he ran over a boulder in the road, and then, realizing he had seen nothing of that sort, he immediately stopped and went back to where he saw the child's body. The officer then testified to making an examination of the truck and finding an abrasion on the left front wheel and a strand of curly blond hair which was similar to that of the child. He further testified that he found nothing unusual on any of the other tires. This testimony was corroborated by Mr. Zimmerman who examined the tires with Officer Eklund and saw the condition thereof as well as the blond hair which the officer found.

Dr. Arthur Wallace, who was called as a witness for plaintiffs, testified that he performed an autopsy on the body of the child; that in the course of the same he observed that there was a contusion of the abdomen; that the abdomen was examined internally and there were no organs injured; that the abdominal wall had been struck; that there was resultant hemorrhage within the wall but not within the abdominal cavity itself; that there were also multiple scratches or abrasions, small lacerated wounds of both upper and lower extremities. The child's death, he further testified, was due to the hemorrhage of the brain caused by the fractures of the bones of the skull. This evidence was first objected to by

counsel for defendants as being immaterial, and thereafter upon the ground that it was offered solely ''for enraging the jury by dwelling on the injuries on the body of the child.'' His motion for a mistrial on that ground was denied by the court. However, the court struck all of the doctor's testimony from the record and instructed the jury ''to strike it from your minds and absolutely disregard it on the grounds it is immaterial.''

Plaintiffs' argument in support of the admission of the testimony of the doctor is that such testimony, when coupled with the testimony of the highway patrolman and Mr. Zimmerman concerning the condition of the left front wheel of the truck and the strand of hair found on the tire, was proper evidence in support of their position that the child was first struck by the front bumper of the truck, thereby knocking him under the truck; that it was the left front wheel of the truck which passed over his body—not the left rear wheel as the driver testified. Defendants reply that since they admit that *a* wheel passed over the child causing death, the testimony of the doctor was merely cumulative and hence it was not error to exclude the same. We cannot agree with this conclusion.

As respondents state, the mere exclusion of cumulative testimony will not ordinarily warrant a reversal, but it is also true that ''All facts having rational probative value are admissible, unless some specific rule forbids.'' (I Wigmore on Evidence 3d, §§ 9 and 10.) A like statement of the rule is found in the early case of *Craven* v. *Central Pac. R. Co.*, 72 Cal. 345 at 350 [13 P. 878]. There the court stated:

''It may be remarked, generally, that, unless the case falls within some well-recognized class of exceptions, an evidentiary fact is relevant to the principal fact when the former tends to show that the latter probably did or did not occur; . . . remoteness usually goes to the weight, and not to the admissibility, of evidence.''

While it is true that evidence at all times is to be confined to the issues, nevertheless ''. . . It is not necessary that it should bear *directly* upon the issue. It is admissible if it *tends* to prove the issue, or constitutes a link in the chain of proof . . .'' (*Firlotte* v. *Jessee*, 76 Cal.App.2d 207 at 210 [172 P.2d 710]), or if it affords any reasonable presumption or inference as to the principal fact or matter in dispute.

Defendants' answer admitted that as a result of the colli-

sion between the truck and the child, the latter "sustained injuries resulting in his death." However, defendants denied negligence in the operation of the truck. The record also shows that when, during the course of the trial, a discussion arose relative to the admissibility of the doctor's testimony, defendants' counsel stated that the defendant driver had admitted it was the left rear wheel of his truck, and that there was no question in counsel's mind but that a "wheel went over the boy." It is now defendants' argument in support of the ruling of the trial court that since the officer and the witness, Zimmerman, testified concerning the hair and the abrasion which were found on the left front wheel, and since it was admitted that a wheel passed over the child, therefore, the testimony of the doctor was only cumulative and no prejudicial error resulted from the action of the trial court in striking the same. Furthermore, say the defendants, the argument of plaintiffs ignores the testimony of plaintiffs' own witness concerning the limited visibility which the driver had while sitting in the driver's seat. Thus, say the defendants, plaintiffs' argument is in direct contradiction of their own evidence and in any event could not have affected the ultimate determination of the case by the jury. Particularly they say this is true in view of the obvious contributory negligence of the mother.

We do not so understand the question posed. It was not as defendants argue whether the child was within the range of view of the driver, but rather whether or not the driver, in view of his knowledge of children being immediately in front of his truck, and his knowledge of his limited visibility to the front and side of the truck, exercised the degree of care that was demanded of him under such circumstances. In view of the state of the record it could not have been both wheels which passed over the child. The only direct evidence was that of the driver, who at the trial testified definitely that it was the left rear wheel. However, in a statement to the police officer immediately following the accident, he said he did not know how the accident occurred. Two witnesses were called by plaintiffs who testified as to the condition of the left front wheel. In resolving the conflict so presented, not alone in the driver's own testimony, but by virtue of the other witnesses the jury had a right to have before it for consideration the evidence offered by the doctor. Certainly, the testimony not only had some "probative value" but it was also a "link in the chain of proof" which was neither

forbidden by any specific rule nor was it too remote. While there is no offer of proof on the part of plaintiffs of additional evidence to be adduced, it is quite apparent that the testimony as the doctor gave it could well be linked into a rational theory as to the manner in which the fatal accident occurred.

Appellants' next contention attacks the giving of an instruction offered by defendants which was as follows:

"*Contributory negligence is negligence on the part of a person injured* which, cooperating in some degree with the negligence of another, helps in proximately causing the injury of which the former thereafter complains.

"*One who is guilty of contributory negligence may not recover from another for the injury suffered.*" (Emphasis added.)

It is appellants' contention that this instruction was erroneous since it referred to the "person injured," which to the lay mind would mean the infant child, and therefore if it was found that the child was contributorily negligent he could not recover from the defendants for the resulting injuries.

In answer to this contention respondents argue that the instruction was explained and made more certain by their instruction Number One which in effect told the jury that the action was brought by the parents of the child; that the defense of contributory negligence had been raised, and that such issue related to the conduct of the parents. Defendants then conclude their argument with the comment that even if the clear and unequivocal language of that instruction did not remove from the minds of the jury any question of contributory negligence on the part of the child, the result was merely a conflict in the instruction which would not warrant a reversal since, from a reading of the charge as a whole and its probable effect upon the jury, it appears unlikely that the jury followed the general language. Furthermore, they argue that no prejudice could have resulted to plaintiffs, particularly in view of the ample evidence of contributory negligence on the part of Mrs. Dike.

▇ The instruction attacked by plaintiffs was taken verbatim from BAJI, Number 103, entitled "Contributory Negligence—Definition." In the note at the top of the instruction, the authors state that the last sentence thereof "is designed to educate jurors as to the reason for the rule of law." But in a negligence case involving a child of 2 years and 1 month

of age there could be no necessity for educating the jurors on the question of contributory negligence as it relates to the "injured person." As the court said in *Conroy* v. *Perez*, 64 Cal.App.2d 217 at page 226 [148 P.2d 680], "While there is no precise age at which, as a matter of law, a child is to be held accountable for his actions, it is obvious that a child of two years and eight months of age could not have sufficient capacity to be guilty of contributory negligence that would bar its parents' recovery for damages for its death; and that it was error to have so instructed the jury." (See also *Gonzales* v. *Davis*, 197 Cal. 256 [240 P. 16], and *Parra* v. *Cleaver*, 110 Cal.App. 168 [294 P. 6].) Here, as in the Parra case "there was no evidence indicating that he had sufficient mind or understanding to enable him to be guilty of contributory negligence, and as the record is barren of any evidence pointing to contributory negligence on his part, we cannot charge him with it."

Paraphrasing the rule above stated, if Barry was incapable of foreseeing the peril to which he was exposed, then no question of his contributory negligence could be submitted to the jury, and if it was error so to do, it necessarily follows it was equally erroneous for the court to instruct the jury as it did in this case.

It further should be noted that the same authority from which the attacked instruction was taken suggests two entirely different instructions as being specifically designed to cover a case such as the present where parents of a child appear alone as plaintiffs and seek to recover for the death of their child. (BAJI, Instructions numbered 146 (a) and 146 (b).) However, neither of those two instructions was given nor was any instruction of any kind given that would have informed the jury in any way concerning the rule as applied to children of such young and tender years.

Furthermore, we cannot minimize as do respondents the effect the instruction had upon the jury by reason of the giving of their instruction Number One, nor can we say as they do that the contributory negligence of Mrs. Dike was so "obvious" that even if the instruction was erroneous no prejudicial error resulted. ▉ Where a jury has been erroneously instructed by injecting into the charge a rule of law completely outside of the issues, the error is not generally remedied by a correct declaration of the general rule involved by other instructions (*Conroy* v. *Perez, supra*), since "It is ordinarily impossible to determine which of the conflicting

rules was followed by the jury.'' (*Wells* v. *Lloyd,* 21 Cal. 2d 452, 458 [132 P.2d 471].)

We conclude therefore that under the facts in this case it was error to have given the attacked instruction. The child involved in this proceeding, as in the Conroy case, was too young to have been capable of foreseeing the peril to which he was exposed, and therefore could not be guilty of contributory negligence, but the jury was not so instructed. To the contrary, it was instructed that he could be. Taking the attacked instruction in its common, everyday meaning the jury was told that if the injured child was contributorily negligent he could not recover from the defendants. In view of all the facts, the instruction at best was ambiguous and could only have confused and misled the jury.

The judgment is reversed.

Schottky, J., concurred.

VAN DYKE, P. J.—I dissent. The errors complained of are, misdirection of the jury and improper rejection of evidence. For such errors we are commanded by the Constitution not to reverse the judgment unless, after an examination of the entire cause, including the evidence, we shall be of the opinion that the errors complained of have resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

The testimony of Doctor Wallace, which the court struck out, was upon matters admitted by the pleadings or at trial, except as to the bruising of the abdominal walls of the deceased child. It is claimed the existence of the bruises would sustain an inference they had been caused by the front of the child's body being struck by the bumper of the milk truck. I agree it was material that plaintiffs should establish, if they could, that the child was fatally injured by being run over by the front tire instead of the rear tire for it affected the conclusion of negligence. The evidence directed to this point was entirely circumstantial. No witness saw the accident. The circumstantial evidence, other than that stricken, consisted of testimony of two witnesses who examined the front tire and found thereon a curly blond hair which matched the hair of the infant, and an abrasion upon the surface of the tire. From this evidence the jury certainly could have inferred that the front tire had struck and passed over the head of the infant, causing its death. Indeed it is difficult, assuming the truth of this testimony—and there was no con-

tradictory testimony—to explain the presence of the hair on the front tire except by inferring that it was that tire which caused death. The evidence excluded, which was likewise circumstantial, was not only cumulative but was most unsatisfactory. It could have no application unless the jury could reasonably infer from the existence of bruises upon the abdominal wall of the infant that these bruises were more probably caused by the bumper of the car than by other means. No expert evidence was offered, and probably none could have been offered, that there was such greater probability. Granting, however, that the evidence could have been so evaluated, it must be said, in fairness, that such evaluation involves more of surmise and speculation than of rationalization. This evidence could have added little, if anything, to the much stronger evidence in the record upon the particular issue under discussion. In my opinion it had no material weight and I think further that the jury would have come to no other conclusion had it been admitted instead of being stricken.

The next error complained of was the giving of an instruction on contributory negligence which had been pleaded in defense and as to which much evidence had been introduced. The plaintiffs, contending that the driver of the truck had been negligent and that his negligence had been the sole proximate cause of the death of the infant, stood in this position: The mother of the child, which child was but two years old, had left the infant about 100 feet away from the point where the accident occurred. She had gone to the scene of the accident to talk with a neighbor woman who was standing close to where the milk truck had been stopped. While she was there the infant, in some unexplained way, wandered from the point where it had been left and went to the same vicinity where the mother had gone. As the truck was about to start the two women and two children began walking away. The mother had not seen the child follow her. The issue of contributory negligence, therefore, was as prominent in the case as was the issue of the driver's negligence. It was, of course, proper that clear and full instructions should be given by the court concerning both issues. On the issue of contributory negligence the court instructed the jury as follows: That contributory negligence was negligence on the part of the *"person injured"* which had cooperated in some degree with the negligence of another and helped in proximately causing *"the injury of which the former there-*

*after complains''*; that the one who is guilty of contributory negligence could not recover from another ''for the injury suffered''; that to establish the defense of contributory negligence the burden was upon the defendants to prove by a preponderance of evidence that *plaintiffs* were, or that *either of them* was, negligent and that such negligence contributed in some degree as a proximate cause of the death; that the action had been brought *by the parents* of the deceased infant and that the defense of contributory negligence had been raised by the answer, thus presenting ''an issue *having to do with the conduct of the parents* who are the plaintiffs in this action relative to their control over, instructions and warnings to, and discipline, care and supervision of, the child, or the absence of a reasonable measure of those factors''; that the question raised in this regard was, ''*Did the parents* and each of them use ordinary care in the exercise of their parental duties, and if not, *did the negligence of the parents or either of them* in that respect contribute in any degree as a proximate cause of the death''; that ''*If the parents, or either of them,* did not use ordinary care in the exercise of their parental duties'' and if this neglect was a ''proximate cause of the injury or death of the child of which they here complain, then the said parents may not recover in this action''; that a violation of law on the part of the driver was of no consequence unless it was a proximate cause ''*of an injury found by you to have been suffered by the plaintiffs.*'' (Italics supplied.)

Now it is contended by the appellants and concurred in by the majority opinion that because once in the instructions contributory negligence was defined as negligence on the part of ''a person injured'' this may have been taken by the jury as referring to the infant child. The assumption is that the ''person injured'' may or could be taken as meaning the person injured physically, and not the person injured financially. This might ordinarily be the meaning, but the assumption cannot be made here. To my mind the assumption has validity only if we disregard a number of matters which ought not to be and in fact cannot be disregarded. There are the facts that this jury knew who the plaintiffs were; that they knew they were not asked to make an award to the child; and that they knew that nowhere in the record had there been any suggestion that the child had been or could have been, in view of its age, guilty of any negligence. This knowledge surely included knowledge that the reference in the instruction to

the person injured was not to the child, but rather, as the instruction so plainly stated, was a reference to one who *sought a recovery,* that is, to the plaintiffs. Over and over the jury were told the issue of contributory negligence dealt with the conduct of the plaintiffs. I think that to consider this instruction, when read with the other instructions, as being error, or to conclude that it confused the jury, is wholly unjustifiable.

There is a third contention of error not treated in the majority opinion, but presented in the briefs, which has to do with a claim the trial court erred in giving an instruction, admittedly correct in form, on the subject of unavoidable accident. Little time need be spent in treating this claim of error. The record presented issues both of negligence and of proximate cause and in such cases it has been held proper to instruct the jury upon the subject of unavoidable accident. (*Parker* v. *Womack,* 37 Cal.2d 116, 120 [230 P.2d 823].)

There is an additional consideration which is that these same contentions of error were presented to the trial judge who heard the case. While this court is not bound by the order denying the motion for new trial, nevertheless the reaction of the trial judge to the motion and his ruling upon it is entitled to weight when the same issues are presented on appeal.

It is my conclusion that there was no error in the instructions and that the striking out of the evidence of the autopsy surgeon was a matter of little moment. This is a case where, in my opinion, the constitutional provision amounts to a clear mandate to this court to affirm the judgment. I would do so.

A petition for a rehearing was denied May 26, 1954. Van Dyke, J., was of the opinion that the petition should be granted. Respondents' petition for a hearing by the Supreme Court was denied June 23, 1954. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.